Kevin ALBRIGHT, Plaintiff–Appellant,

v.

Roger OLIVER, individually and in his official capacity as a police detective with the City of Macomb, Illinois, and City of Macomb, Illinois, an Illinois Municipal Corporation, Defendants–Appellees.

No. 91–3746.

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1992.

Decided Sept. 14, 1992.

John H. Bisbee (argued), Macomb, Ill., for plaintiff-appellant.

James G. Sotos (argued), James G. Sotos, Schirott & Hervas, Itasca, Ill., for defendant-appellee.

Before BAUER, Chief Judge, POSNER, Circuit Judge, and GIBSON, Senior Circuit Judge.*

POSNER, Circuit Judge.

The district judge granted the defendants' motion to dismiss the complaint in this constitutional tort case (brought under 42 U.S.C. § 1983) for failure to state a claim, so we take the facts to be as alleged in the complaint, without of course vouching for their truth. The plaintiff is Kevin Albright. The defendants are Roger Oliver, an experienced police detective employed by the City of Macomb, Illinois, the home of Western Illinois University; and the City itself. In March 1987 Oliver hired a cocaine addict, Veda Moore, as an informant. She had come to him seeking protection from a drug dealer who was threatening her because she owed him money. Oliver insisted that she work for him as an undercover informant, in exchange for which he promised her his protection and some pay. Her job for Oliver was to buy cocaine and report the sellers to him. She used the money that he paid her for this information to buy cocaine for her own consumption.

In June she reported having bought cocaine from John Albright, Jr. at a hotel room in Macomb. She turned over the "cocaine" to Oliver; it turned out to be baking soda. Without further investigation, Oliver testified about the transaction before a state grand jury, which returned an indictment against John Albright, Jr. for sale of a "look alike" (alike to an illegal drug, that is) substance in violation of Ill. Rev.Stat. ch. 56½, ¶ 1404(b). Oliver then went to John Albright, Jr.'s home to arrest him, but found that Albright was an elderly, respectable, inoffensive gentleman unlikely to have committed the offense of which Veda Moore had accused him. But

in response to Oliver's question did Albright have any sons Albright told him that maybe Oliver was looking for his son John David Albright. So Oliver altered the name on the arrest warrant to John David Albright and went to arrest him—only to discover that he had been in Chicago at the time of the alleged offense.

There was another son, Kevin Albright, a senior at Western Illinois University. Oliver called Moore and asked her whether the man from whom she had bought the baking soda might be Kevin Albright. She said it was he all right. A criminal information was issued charging Kevin Albright with the offense, followed (on October 16, 1987) by an arrest warrant. Learning of the warrant, Kevin Albright turned himself in, acknowledging to Oliver that he had been in Macomb on the date of the alleged offense but denying any involvement in drug trafficking. He was booked and required to post bond; one (mandatory) condition of bond was that he not leave the state without the court's permission. Ill. Rev.Stat. ch. 38, ¶ 110-10(a)(3). At the preliminary hearing, held on January 5, 1988, Oliver testified about Veda Moore's information without however revealing his initial efforts against the other two Albrights, and the judge found probable cause to make Kevin Albright stand trial. But on June 27, before the trial could be held, the circuit court dismissed the information against Kevin Albright on the ground that it failed to state an offense under Illinois law. (We do not know why not; we have not been able to find a copy of the decision.) The prosecution had received media coverage. And Albright had missed a job interview in St. Louis—he says because of the prohibition against his leaving the state, although he did not request the court's permission to leave, as he could have done under the terms of the bond.

■ The present suit was brought one day short of two years after the dismissal of the prosecution. The complaint states a plausible claim for false arrest. It is true that Kevin Albright was not arrested in the

* Hon. Floyd R. Gibson of the Eighth Circuit, sitting by designation.

conventional sense—he turned himself in. But it is enough that he was booked; that was a seizure of his person within the meaning of the Fourth Amendment. *Voytko v. Ramada Inn of Atlantic City,* 445 F.Supp. 315, 320, 324 (D.N.J.1978). And probably the "arrest" lacked probable cause. Detective Oliver made no effort to corroborate Veda Moore's unsubstantiated accusation. A heap of baking soda was no corroboration. Her initial misidentification of the seller cast grave doubt on the accuracy of her information. And this was part of a pattern: of fifty persons she reported to Oliver as trafficking in drugs, none was successfully prosecuted for any crime. In the case of "Albright," Oliver should have suspected that Moore had bought cocaine either from she knew not whom or from someone she was afraid to snitch on (remember that she had gone to work for Oliver in the first place because she was being threatened by a man to whom she owed money for previous purchases of cocaine), that she had consumed it and replaced it with baking soda, and that she had then picked a name from the phone book at random. The fact that she used her informant's reward to buy cocaine makes this hypothesis all the more plausible. An arrest is a serious business. To arrest a person on the scanty grounds that are alleged to be all that Oliver had to go on is shocking. The limits of reasonable police conduct, illustrated by our recent decision in *Davis v. Owens,* 973 F.2d 574 (7th Cir.1992), may well have been exceeded here—always assuming that the facts alleged in the complaint are true.

But Kevin Albright filed his suit more than two years after his arrest, so his constitutional claim of false arrest was barred by the statute of limitations. *Wilson v. Garcia,* 471 U.S. 261, 276, 105 S.Ct. 1938, 1947, 85 L.Ed.2d 254 (1985); Ill.Rev. Stat.1991, ch. 110, ¶ 13–202. He has therefore had to base this suit on the events after the arrest, that is, on the prosecution itself, which ended on June 27, 1988, when the charges against him were dropped, and which he characterizes as malicious. He contends that malicious prosecution is, or

at least in particular circumstances can be, a constitutional tort.

██ As noted in *Brummett v. Camble,* 946 F.2d 1178, 1180 n. 2 (5th Cir.1991), this is a question on which there is an embarrassing diversity of judicial opinion. The Supreme Court has not opined on the question, but its decision in *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), holding that defamation by a public officer is not a constitutional tort, provides a clue to the answer that the Court is likely to give if it ever agrees to review a case that presents the question. The Court could have equated reputation to property and held that a tortious injury to reputation is analytically the same as a conversion of property, which is actionable in a civil rights suit if done intentionally by a state officer. *Kimbrough v. O'Neil,* 545 F.2d 1059 (7th Cir.1976) (en banc); *Augustine v. Doe,* 740 F.2d 322, 327 (5th Cir.1984); *Bayron v. Trudeau,* 702 F.2d 43, 45 and n. 2 (2d Cir.1983). It declined to make this equation. It did not want to draw the whole body of public-officer state law into the federal courts in the name of civil rights. Malicious prosecution, whether civil or criminal, resembles defamation. It is a deliberate accusation of wrongdoing calculated to embarrass the defendant, disrupt his activities, and put him to the expense of defending himself. Since a malicious prosecution is by definition groundless, it does not impose punishment costs, not usually anyway. In the end the defendant is exonerated, though the end may come after punishment had been imposed or commenced, for example if the prosecution had been founded on forged documents not exposed till after the defendant had been convicted and imprisoned, as was alleged to be the case in *King v. Goldsmith,* 897 F.2d 885 (7th Cir.1990). The medley of harms that a malicious prosecution inflicts when, as in this case, the defendant is exonerated before any punishment is imposed—indeed before he is even put on trial—is similar to that inflicted by defamation, which by impairing a person's reputation not only embarrasses and even outrages him but also undermines his ability to make favorable transactions, whether busi-

ness or personal, thereby subjecting him to costs pecuniary or nonpecuniary or both. It also puts him to the expense of bringing a suit for defamation to recover his good name. If the injuries that defamation imposes do not constitute a deprivation of liberty or property within the meaning of the due process clause, then neither do the injuries that malicious prosecution imposes.

But like defamation, malicious prosecution can be a component of a constitutional tort. Defamation accompanying a discharge from employment can make it impossible for a person to obtain equivalent employment elsewhere, thus depriving him of liberty of occupation, one of the liberties protected by the due process clause. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 102, 96 S.Ct. 1895, 1905, 48 L.Ed.2d 495 (1976); *Colaizzi v. Walker*, 812 F.2d 304, 307 (7th Cir.1987); *Lawson v. Sheriff of Tippecanoe County*, 725 F.2d 1136 (7th Cir.1984). In this example the concept of liberty is used to make constitutional tort liability for defamation by public officers narrower than common law liability. The same analytical process is available to deal with the parallel case of malicious prosecution. Malicious prosecution can result in a person's being thrown into jail to await trial, and incarceration is of course no less a deprivation of liberty within the meaning of the due process clause than exclusion from an occupation. *United States v. Salerno*, 481 U.S. 739, 746, 107 S.Ct. 2095, 2101, 95 L.Ed.2d 697 (1987); *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1808–09, 60 L.Ed.2d 323 (1979); *Villanova v. Abrams*, 972 F.2d 792 (1992). But Kevin Albright, though a recipient of unfavorable media publicity, does not contend that he is either unemployable as a result of his prosecution or that he was put in jail or even forced to stand trial. And he does not argue that being required to appear for a probable cause hearing is the equivalent of incarceration.

■ He was, it is true, "confined" to Illinois; and if Denmark was a dungeon to Hamlet (as the latter claimed), we suppose Illinois could be a prison to Kevin Albright. The tort of false imprisonment does not require close confinement. *Robinson & Co. v. Green*, 148 Ala. 434, 43 So. 797 (1906); *Restatement (Second) of Torts* § 36, comment b (1965). The "prison" could indeed be as large as an entire state. *Id.*, § 36, illustration 7. But constitutional torts do not follow the exact contours of their common law counterparts. The element of confinement was further attenuated here by the fact that Albright could leave Illinois if he obtained leave of court. As he did not feel sufficiently restive, notwithstanding the possibility of a job interview across the state line in St. Louis, to request that leave, we do not think he was "confined" to the point of being deprived of constitutional liberty. If you close a person in the room but the person has a key (and knows it), you have not committed false imprisonment. *Lopez v. Winchell's Donut House*, 126 Ill.App.3d 46, 81 Ill.Dec. 507, 466 N.E.2d 1309 (1984); Restatement, *supra*, § 36(2), and comment a and illustration 1. A *fortiori* you have not deprived him of his constitutional liberty. The analogy is not exact, but suppose you told a person that you had locked the door but would open it as soon as he wanted to leave, provided he asked for it politely—and he never asked, or made any motion to leave. Would *that* be false imprisonment? Who knows? But it would not be a sufficient deprivation of liberty to actuate constitutional remedies. Quite apart from *Paul v. Davis*, the courts have declined to equate every infringement of an interest protected at common law to a deprivation of a constitutionally protected liberty. *Hudson v. McMillian*, — U.S. —, 112 S.Ct. 995, 1000, 117 L.Ed.2d 156 (1992); *Cameron v. Internal Revenue Service*, 773 F.2d 126, 129 (7th Cir.1985); *Davis v. Forrest*, 768 F.2d 257, 258 (8th Cir.1985); *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir.1973) (Friendly, J.).

■ In cases such as these the concept of constitutional "liberty" is used as a gatekeeper to limit access to the federal courts by persons complaining of the pettier sort of official outrage. Liberty so conceived has a qualitative as well as a quantitative dimension. The State of Illinois could not impose a criminal sentence on Albright without according him due pro-

cess of law, even if the sentence were merely that he remain in Illinois for a time unless he got a judge's permission to leave. But a similarly modest infringement of liberty is not actionable when, being merely a by-product of some less ominous form of public coercion than the imposition of criminal punishment, it is farther from the core of constitutionally protected liberty. We do not place malicious prosecution in the class of trifling infringements of the right to be free from oppression by public officers; but in the absence of incarceration or other palpable consequences we do not think it should be actionable as a constitutional wrong. In a case such as this, where the prosecution collapses before trial, just as in the garden-variety public-officer defamation case that does not result in exclusion from an occupation, state tort remedies should be adequate and the heavy weaponry of constitutional litigation can be left at rest. The multiplication of remedies for identical wrongs, while gratifying for plaintiffs and their lawyers, is not always in the best interest of the legal system or the nation.

Albright's energetic and tenacious counsel seeks to escape the conclusion that malicious prosecution is not actionable as a constitutional tort by pointing out that the Supreme Court has recognized a constitutional right to travel of which, he argues, the conditions in the bond deprived his client. E.g., *Kent v. Dulles*, 357 U.S. 116, 125, 78 S.Ct. 1113, 1117–18, 2 L.Ed.2d 1204 (1958); *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 254, 94 S.Ct. 1076, 1080, 39 L.Ed.2d 306 (1974). He does not, of course, suggest that courts which impose travel restrictions on persons awaiting trial for criminal offenses, or which jail them pending trial because they can't make bail or are regarded as a flight risk or a menace to the community, are engaged in wholesale violations of the right. *United States v. Lockett*, 526 F.2d 1110, 1112 (7th Cir.1975). As a flight risk is the most eager of travelers, such a proposition would be extravagant even by the elastic standards of constitutional argumentation. The argument rather is that detective Oliver caused Albright to lose his freedom of travel by setting the prosecution in motion without (whatever the judge at the preliminary hearing said—he wasn't given a full picture) probable cause to believe that Albright had actually committed a drug offense.

■ If Oliver had been trying to confine Albright to Illinois, Albright might have an argument based on cases such as *Kent v. Dulles* that involve the denial of passports to Americans wanting to travel abroad. It would not be a strong argument. Not because *Regan v. Wald*, 468 U.S. 222, 240–42, 104 S.Ct. 3026, 3036–3038, 82 L.Ed.2d 171 (1984), confines the passport cases to First Amendment situations, where a passport is denied to persons on the basis of their beliefs; for *Regan* still requires that *some* justification be shown for limiting the right to travel, conceived of as a right conferred by the due process clause, even if the First Amendment is not involved. There was no justification here, if the prosecution was malicious. But we do not understand Albright to be arguing that Oliver intended to curtail his right to travel, though this was a foreseeable incident of the prosecution. More important, it is not clear that the right was materially curtailed, given the terms of the bond.

■ We said earlier that the due process phase of the case would be different if Albright had been incarcerated, and he would have been had he not posted bond— so should the cost of the bond ($350—10 percent of the face amount of the bond) be considered a substitute deprivation? If jail deprives a defendant of liberty, shouldn't money in lieu of jail deprive him of property? Well, but bond money is refundable if the defendant does not violate the terms of the bond. Had Albright posted the full bond ($3,500) he would have gotten it back, but instead he chose to pay a nonrefundable fee of $350 in lieu of bond. Such a fee should be treated no differently from attorney's fees. It was an incidental expense of a lawsuit that terminated in his favor. Obviously the expense of the fees that the plaintiff in a defamation case incurs is not a deprivation of property that enables him to bring suit against the public officer who defamed him. That would undo *Paul v. Davis*. No more should it be the shoehorn that squeezes malicious prosecution into

the due process clause. *Easter House v. Felder*, 910 F.2d 1387, 1407 (7th Cir.1990) (en banc).

 Albright next argues that the prosecution denied him the equal protection of the laws. He does not claim to have been singled out for prosecution because he was black or a member of some other minority, but he points out that a class with only one member can still complain of discrimination against his tiny class. *United States v. Falk*, 479 F.2d 616, 619 (7th Cir.1973) (en banc); *Falls v. Town of Dyer*, 875 F.2d 146 (7th Cir.1989). Indeed, one might suppose that the smaller the class, the less able it would be to protect itself in the political arena, and therefore the greater the danger that it might be singled out for oppression. But you must be singled out because of your membership in the class, and not just be the random victim of governmental incompetence. To close the question left open in *Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir.1992), we hold that "the state's act of singling out an individual for differential treatment" does *not* "itself create the class." That would make every selective prosecution, and indeed every arbitrary act of government, a violation of the Constitution.

Even if, as Albright suggests, the class of innocent persons could be regarded as a protected group for purposes of the equal protection clause (an implausible suggestion, for while we are not a law-abiding society, the innocent are not yet an oppressed minority among us), no one supposes that Oliver went after Albright *because* Albright was innocent. At worst, Oliver failed to discriminate carefully between the probably guilty and the probably innocent. It is not suggested that he has a perverse desire to punish the innocent and leave the guilty alone. Or that he has it in for anyone named Albright.

There are some other issues and arguments but they need not be discussed. The case was properly dismissed.

AFFIRMED.