**James J. GALLO, et al.**

v.

**CITY OF PHILADELPHIA.**

**Civil Action No. 96–3909.**

United States District Court,
E.D. Pennsylvania.

Aug. 15, 1997.

David L. Lockard, Philadelphia, PA, for plaintiffs.

Jeffrey M. Scott, Office of the City Solicitor, Philadelphia, PA, for City of Philadelphia.

Jay M. Levin, Cozen & O'Connor, Philadelphia, PA, for Rizzo, Goldberg, and Cozen & O'Connor.

Robert G. Hanna, Jr., Marshal, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Kufta.

*MEMORANDUM*

DALZELL, District Judge.

I. *Factual Background*

On the morning of Sunday, June 11, 1989, a fire erupted at Gallo Cabinets, a custom cabinet shop plaintiff James J. Gallo owned

and operated in Philadelphia. The Fire Department quickly arrived and put out the flames, but not before the store was extensively damaged.

Defendant Assistant Fire Marshall Lt. Renald Pelszynski also arrived on the fire scene that Sunday morning to begin his investigation into the cause of the fire. "At some point after Pelszynski's initial inspection," according to Gallo, Lt. Pelszynski prepared the following Fire Marshal's Incident Report:

> Method of IGN [*i.e.*, "ignition"]: Heating Iron to Class A Combustibles
>
> Investigation: Disclosed the fire originating along the north wall towards the west corner of 1724. The fire originates on a wood shelf adjacent to a wall mounted box housing a duplex electrical outlet and an electrical switch. An electrical heating iron used for a lamination process was plugged into the top of the duplex outlet and the iron was found on the wooden shelf. All insulation was burned away from the cord as a result of the fire. An approximately 1 foot long piece of electrical cord remained in the bottom part of the duplex with slight beading noted at the end of the cord. The owner reports that a retracting extension cord was kept plugged in there. Note—the heating iron in question has no on/off switch. Temperature adjustment can be made but the unit must be unplugged to de-energize it.
>
> This property was the site of a 2 alarm fire on 10/25/88. Lt. Sheldon's investigation, cause: electric/wiring.

Ex. 2 of Pls.' Mem. of Law in Response to City of Philadelphia's Mt. for Partial Summ. J. (hereinafter "Pls.' Mem. of Law at Ex. ——.")  .

Gallo maintains that the salient point in the report is that Lt. Pelszynski listed the cause of the fire as "ELEC/APPL," meaning, Gallo contends, that Lt. Pelszynski believed an electrical appliance caused the fire, specifically, a "Heating Iron to Class A Combustible." Although Gallo does not know when this report was prepared, he claims that it was the "original report." *See* Pls.' Mem. of Law at 8.

Gallo then filed a claim for damages with his insurance carrier, defendant Pennsylvania Lumbermens Mutual Insurance Co. ("PLM"). PLM hired defendant Gerald Kufta of Kufta Associates to conduct an investigation into the cause of the fire at Gallo Cabinets. Defendant Kufta Associates in turn retained the law firm of Cozen & O'Connor and its Director of Investigations—and former Philadelphia Fire Commissioner—Joseph Rizzo, to assist in the investigation. Both Cozen & O'Connor and Rizzo are also defendants in this case.

Gallo claims that Kufta and Rizzo visited the fire scene on June 13, 1989. That same day, Rizzo called Lt. Pelszynski, *see* Pl.'s Mem. of Law at Ex. 3 (time records for Cozen & O'Connor at entry no. 2). Kufta also spoke to Lt. Pelszynski before visiting the fire scene and spoke to him at least once thereafter. *See* Kufta's Dep. at 94 (attached to Pls.' Mem. of Law at Ex. 4).

Gallo claims that, after speaking with Rizzo and Kufta, Lt. Pelszynski changed his previously prepared Fire Marshal's Incident Report. *See* Pls.' Mem. of Law at 5. The "revised" Incident Report states, in addition to the text quoted above,

> Method of IGN: Open Flame
>
> . . . .
>
> . . . .
>
> The owner, in a telephone interview, stated that the business had closed on Friday at approximately 4:30 pm that the heating irons are no longer used in their laminate process.
>
> Attachment: At 10:00am, 6/28/89, Mr. James Gallo Jr. presented himself at the F.M.O., 3rd & Spring Garden Sts., for a scheduled interview with Lts. R. Pelszynski & J. O'Drain. Mr. Gallo informed Lts. Pelszynski & O'Drain that upon the advice of his lawyer, David Pallett—790-1444, he declined to answer any questions. Mr. Gallo then left the F.M.O. at approximately 10:15am.
>
> It is the opinion of this writer that the cloth was deliberately wrapped around the heating iron several times. The iron was energized by an adjacent duplex outlet controlled by an on/off switch

which was found in the on position. The physical examination of the cloth wrapping indicated the damage to be consistent with an external heat application. That heat having been caused by an open flame application to Class A combustible materials present on the shelf by an intentional design.

"At some point thereafter" Lt. Pelszynski referred the Gallo Cabinets investigation to the joint Philadelphia–Federal Arson task force. Pls.' Mem. of Law at 6.[1] In July of 1990, the United States Attorney's Office for our District launched an investigation into the fire at Gallo Cabinets, and, on May 31, 1994, a grand jury indicted Gallo on two counts of mail fraud, one court of malicious destruction of a building by fire, and one count of making a false statement to obtain a loan. Defendants Thomas J. Rooney and William J. Campbell, Special Agents of the Federal Bureau of Alcohol, Tobacco, and Firearms ("ATF"), were involved in the federal investigation and eventual criminal prosecution of Gallo.

Gallo's criminal defense attorney then served federal prosecutors with requests for "production of all exculpatory evidence and documents pursuant to *Brady v. Maryland.*" Pls.' Mem. of Law at 8. Gallo claims that the Government failed immediately to produce or disclose the existence of the "original" Fire Marshal's Incident Report, which, Gallo asserts, ruled the fire at his store to be accidental. *See id.; see supra* pp. 723–724 (quoting report).

Gallo's lawyer also served Cozen & O'Connor, PLM, Kufta, Rizzo, and Lt. Pelszynski with subpoenas, pursuant to Fed.R.Crim.P. 17(c), to produce "all materials contained in their files relating to the Gallo fire." *Id.* at 9. Gallo charges that these defendants, like the Government, failed immediately to produce or disclose the existence of Lt. Pelszynski's "original" Incident Report. *See id.*

Finally, on January 6, 1995, the Government produced a copy of Lt. Pelszynski's "original" Incident Report. According to Gallo, "[t]his was the first notice Gallo had as to the fact and existence of a second report Fire Marshal's Incident Report different from the one that was ultimately issued by the Fire Department." Pls.' Mem. of Law at 9.

A week later, on January 13, 1995, Gallo pled guilty to one count of bank fraud in connection with overstating his income in order to obtain a line of credit from Bell Savings Bank. Gallo went to trial, however, on the remaining two counts of the federal indictment on March 21, 1995, and on April 19, he was acquitted of both charges.

Over a year later, on May 23, 1996, Gallo and his wife, Rose Maria Gallo, filed this § 1983 suit against the City of Philadelphia, Lt. Pelszynski, Kufta, Kufta Associates, Cozen & O'Connor, Rizzo, Mitchell Goldberg, an attorney at Cozen & O'Connor, and PLM.[2] On January 2, 1997, Gallo filed a new suit, C.A. No. 97–7, against ATF Agents Rooney and Campbell, asserting that they deprived him of his constitutional rights when they failed to produce or disclose the existence of the "original" Incident Report to Gallo until January of 1995, three months before Gallo's criminal trial.[3]

The City of Philadelphia and Lt. Pelszynski have now moved for partial summary judgment, and ATF Agents Rooney and Campbell have filed a motion to dismiss the case against them. For the reasons elaborated below, we shall grant both motions.

## II. *Legal Analysis*

In order to make sense of the complaint here, it is first necessary to understand what is not at issue.

Gallo does not claim that his rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct.

---

1. PLM, citing arson as the cause of the fire, denied Gallo's insurance claim in June of 1990. Gallo eventually settled his insurance claim with PLM for $25,000 in the fall of 1992. *See* Pls.' Mem. of Law at 7. PLM has not brought to our attention any release Gallo may have signed in consideration for this settlement.

2. Rizzo, Goldberg, and Cozen & O'Connor have cross-claimed against the City of Philadelphia and Lt. Pelszynski. Likewise, PLM has cross-claimed against all the other defendants.

3. We on January 8, 1997, consolidated this case under C.A. No. 96–3909.

1194, 10 L.Ed.2d 215 (1963), were violated because, as he himself admits, the Government produced Lt. Pelszynski's "original" (and, in Gallo's mind, "exculpatory") report to him three months before the start of his criminal trial. *See* Pls.' Mem. of Law at 13 n. 9. Gallo also does not claim that his criminal trial was in any way unfair because, as he himself asserts, he was able to cross-examine witnesses, including Lt. Pelszynski, with the "exculpatory report." *See* Pls.' Mem. of Law at 15 ("In this case, it is not the fairness of the trial which is the basis for the § 1983 claim, but the fairness of the prosecution.").

Instead, Gallo characterizes his § 1983 claim as follows:

> The constitutional wrong being alleged here is not that the exculpatory report was withheld from plaintiff.[4] It was that the report was withheld from the *Assistant U.S. Attorney.* Plaintiff should never have been prosecuted for arson in the first place. If defendants had disclosed to the prosecutor the report and the circumstances of its alteration, Gallo never would have been [*sic*]. Even if the U.S. Attorney had· been so misguided as to seek an indictment on these tenuous facts, the grand jury—confronted with two contradictory incident reports and no coherent explanation—would probably have refused. By the time the report was finally produced, the harm had already been done. Gallo had been under indictment for seven months, despite the utter lack of probable cause to charge him with arson.

Pls.' Mem. of Law at 12–1:3.

Thus, Gallo hypothesizes that if federal prosecutors had known about or had been told about the "exculpatory report," the Government would not have prosecuted him. And if the Government had, notwithstanding the "exculpatory report," decided to prosecute him (which, of course, it did), the grand jury, Gallo speculates, would have performed the function envisioned for it under the Fifth Amendment and would have refused to indict him.

Gallo in essence claims that his constitutional rights were violated because the Government did not weigh the evidence in his criminal case as he would have and because the proceeding did not cease solely because there was exculpatory evidence that (in Gallo's mind at least) should have aborted his prosecution. Stripping the allegations to their core, Gallo's complaint is that he was maliciously prosecuted. *See* Pls.' Mem. of Law at 11.

■ There is no Fourteenth Amendment substantive due process right to be free from malicious prosecution. *See Albright v. Oliver,* 510 U.S. 266, 269–71, 114 S.Ct. 807, 811, 127 L.Ed.2d 114 (1994); *Singer v. Fulton County Sheriff,* 63 F.3d 110, 115 n. 3 (2d Cir.1995) (quoting excerpts from all four concurring opinions in *Albright* for the proposition that a plaintiff may not assert a claim for malicious prosecution as a substantive due process claim), *cert. denied,* —— U.S. ——, 116 S.Ct. 1676, 134 L.Ed.2d 779 (1996); *Perez–Ruiz v. Crespo–Guillen,* 25 F.3d 40, 42 (1st Cir.1994) ("*Albright* would appear virtually to foreclose reliance on substantive due process as the basis for a viable malicious prosecution claim under section 1983 . . . ."). The Supreme Court has, however, not foreclosed the possibility that a malicious prosecution cause of action may be actionable under the Fourth Amendment in a § 1983 claim. *See Albright,* 510 U.S. at 273–75, 114 S.Ct. at 813; *Singer,* 63 F.3d at 115 n. 4 (analysis of the four separate opinions in *Albright* yields the conclusion that the Fourth Amendment is the source for a § 1983 action premised on a person's arrest); *Smart v. Board of Trustees,* 34 F.3d 432, 434 (7th Cir.1994) (reading *Albright* as allowing malicious prosecution claims so long as they are brought under the Fourth Amendment), *cert. denied,* 513 U.S. 1129, 115 S.Ct. 941, 130 L.Ed.2d 885 (1995). Accordingly, we will view Gallo's malicious prosecution claim as one asserting a deprivation of his Fourth Amendment right to be free from an unreasonable seizure. *See* Compl. at ¶¶ 134–35.

---

4. The "exculpatory report" refers to the "original" Fire Marshal's Incident Report Lt. Pelszyn- ski allegedly prepared. *See supra* at page 723.

In addition to the constitutional elements necessary to establish a claim under § 1983,[5] a plaintiff alleging malicious prosecution must demonstrate that (1) the defendants initiated a criminal proceeding; (2) the criminal proceeding ended in the plaintiff's favor; (3) the proceeding was initiated without probable cause; and (4) the defendants acted maliciously or for a purpose other than bringing the plaintiff to justice. *See Torres v. McLaughlin*, No. 96-5865, 1996 WL 680274, at *6 (E.D.Pa. Nov.21, 1996) *("Torres I")*; *see also Hilfirty v. Shipman*, 91 F.3d 573, 579 (3d Cir.1996) (citing *Haefner v. Burkey*, 534 Pa. 62, 626 A.2d 519, 521 (1993)).

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—*i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.' " *Singer*, 63 F.3d at 116 (2d Cir.1995); *see also Torres I*, 1996 WL 680274, at *6; *Torres v. McLaughlin*, 966 F.Supp. 1353, 1361 n. 7 (E.D.Pa.1997), *appealed on other grounds docket*, June 23, 1997 *("Torres II ")*.

■ Gallo was indicted on May 31, 1994, and, two months later, on August 4, 1994, he was arraigned before United States Magistrate Judge M. Faith Angell, *see* Pls. Mem. of Law at Ex. 10 (Notice of Arraignment), who released Gallo on a $10,000 own-recognizance bond. *See* Pls.' Mem. of Law at 16. Gallo was also prohibited from traveling beyond the borders of the Commonwealth of Pennsylvania and the State of New Jersey, and he was ordered to "check in" with Pretrial Services on a weekly basis. These pretrial release conditions remained in place until his acquittal eight and a half months later. *See id.*

The question before us is whether these "restraints" on Gallo's liberty during the prosecution of his criminal case amount to a deprivation of Gallo's Fourth Amendment right to be free of an unreasonable "seizure." This case is not the first time we have addressed this issue, for in *Torres II*, 966 F.Supp. 1353, we recently had occasion to canvass this evolving area of the law.

Gallo's argument that he suffered constitutionally-significant pretrial restraints on his liberty finds support in Justice Ginsburg's concurrence in *Albright v. Oliver*, 510 U.S. 266, 278, 114 S.Ct. 807, 815, 127 L.Ed.2d 114 (1994), which, as we explained in *Torres II*, suggested that someone in Gallo's position suffers a "seizure" under the Fourth Amendment, even while not in physical custody, as long as the criminal charges against him remain pending. *See Torres II*, 966 F.Supp. at 1360. Justices Souter, Stevens, and Blackmun, we also noted, appeared to support Justice Ginsburg's view. *See id.* at n. 6.

In *Torres II* we described what we believe to be the shortcomings of adopting Justice Ginsburg's view of what constitutes a Fourth Amendment pretrial "seizure." First, we

---

5. To recover under § 1983, Gallo must plead and prove two elements. First, there must be a deprivation of Gallo's "rights, privileges, or immunities secured by the Constitution and laws" of the United States. *Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *see Parratt v. Taylor*, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981). Section 1983 is not in itself a source of substantive federal rights. *See Albright*, 510 U.S. at 269-71, 114 S.Ct. at 811. Instead, in order to state a cognizable § 1983 claim, a plaintiff must allege a violation of a particular federal right. *See Albright*, 510 U.S. at 269-71, 114 S.Ct. at 811; *Heck*, 512 U.S. at 483, 114 S.Ct. at 2370 (section 1983 creates "a species of tort liability" for redressing deprivations of federal constitutional rights (quoting *Stachura*, 477 U.S. at 305, 106 S.Ct. at 2542)); *Carey v. Piphus*, 435 U.S. 247, 253, 98 S.Ct. 1042, 1046-47, 55 L.Ed.2d 252 (1978) (section 1983 "was intended to '[create] a species of tort liability' in favor of persons who are deprived of rights, privileges, or immunities secured' to them by the Constitution." (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417, 96 S.Ct. 984, 988-89, 47 L.Ed.2d 128 (1976))). In a § 1983 malicious prosecution claim, the constitutional basis for the claim is, as explained above, the Fourth Amendment.

Second, Gallo must allege and prove that the defendants deprived him of these constitutional rights "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Monroe v. Pape*, 365 U.S. 167, 171-88, 81 S.Ct. 473, 475-85, 5 L.Ed.2d 492 (1961); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150, 90 S.Ct. 1598, 1604-05, 26 L.Ed.2d 142 (1970).

noted that if a criminal defendant need not have been subject to any significant pretrial restrictions on his liberty in order to assert a viable § 1983 malicious prosecution claim, the constitutional element of a § 1983 claim is excised. *See Torres II,* 966 F.Supp. at 1361 (citing *Niemann v. Whalen,* 911 F.Supp. 656, 670–71 (S.D.N.Y.1996); *Williams v. Weber,* 905 F.Supp. 1502, 1511–12). "In effect," we reasoned, "every state·law claim for ... malicious prosecution would, without more, also state a claim under § 1983." *Torres II,* 966 F.Supp. at 1361. We concluded that Justice Ginsburg's expansive view of a Fourth Amendment seizure should be rejected because it would result in an outcome "contrary to what the Supreme Court has repeatedly noted as the purpose of § 1983: to create 'a species of tort liability in favor of persons who are deprived of rights, privileges, or immunities secured to them by the Constitution.' " *Id.* at 1362 (quoting *Memphis Community School Dist. v. Stachura,* 477 U.S. 299, 305–06, 106 S.Ct. 2537, 2542, 91 L.Ed.2d 249 (1986)); *see also id.* at 1361 n. 7.

Next, we observed that:

> Justice Ginsburg's concurrence is also contrary to the Supreme Court's holding in *Gerstein v. Pugh,* 420 U.S. 103, 114 [95 S.Ct. 854, 863–64, 43 L.Ed.2d 54] (1975). In *Gerstein,* while recognizing that the conditions attached to a criminal defendant's pretrial release may be so burdensome as to effect a significant restraint on liberty, the Court held that ordinarily the Fourth Amendment requires a probable cause determination for the commencing of criminal charges only when a defendant suffers extended restraints on his liberty other than merely having to appear for trial. *Id.* at 125 n. 26 [95 S.Ct. at 869 n. 26]. Justice Ginsburg's concurrence, in contrast, suggests that merely requiring a defendant to appear before a court for hearings or trial, standing alone, constitutes a deprivation of liberty of sufficient constitutional injury.

*Torres II,* 966 F.Supp. at 1362 (citing *Niemann,* 911 F.Supp. at 670; *Williams,* 905 F.Supp. at 1511–12).

Third, we explained that, contrary to the Supreme Court's holding in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994), Justice Ginsburg's concurrence would do away with the common law distinctions between the torts of false arrest and malicious prosecution. *See Torres II,* 966 F.Supp. at 1362–63. We reasoned that, if Justice Ginsburg's suggestion were heeded and the Fourth Amendment given "full sway" so that plaintiffs like Gallo no longer need to fit their claims into the molds of the common law torts, then the extensive body of federal case law defining when the appropriate statute of limitations is triggered would be abandoned. *Id.* at 1363.

Finally, we explained that the courts that have addressed the issue have observed that, while "every person who is the victim of an unlawful prosecution must spend time, money and emotional resources preparing a defense" and that "[c]learly, every person subject to an unlawful prosecution faces the possibility of reputational harm ..., *Niemann,* 911 F.Supp. at 670, these types of deprivations simply do not qualify as a deprivation of liberty meriting Fourth Amendment protection." *See Albright v. Oliver,* 975 F.2d 343, 346 (7th Cir.1992), *aff'd,* 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994).

For example, we found in *Torres II* that "[h]aving to appear in state court for his preliminary hearings, arraignment and trial were the only 'restraints' on Torres's liberty. Torres ... did not have to post any money bail to be released on the day he was arrested ..., nor on any subsequent date, nor was he prohibited from traveling outside of the Commonwealth under the conditions of his bond." 966 F.Supp. at 1364. We concluded that "[a]bsent any constitutionally-significant pretrial restraints on Torres's liberty, the weight of federal authority (at least as it stands today) holds that Torres may not maintain a § 1983 claim for malicious prosecution based on the pre-incarceration time period." *Id.*[6] (citing *Leone v. Creighton,* 948

---

**6.** By contrast, Torres was "seized" within the meaning of the Fourth Amendment when he was incarcerated after being found guilty at trial. We thus held that he could maintain a § 1983 mali-

F.Supp. 192, 195 (E.D.N.Y.1996) (a criminal defendant who was subjected to a "baseless charge of harassment" does not state a Fourth Amendment violation); *Maldonado v. Pharo*, 940 F.Supp. 51, 54 (S.D.N.Y.1996) (finding that an order to return to court and "psychological trauma allegedly suffered as a result of [having] the charges pending" did not constitute the requisite constitutional injury); *Johnson v. City of New York*, 940 F.Supp. 631, 635 (S.D.N.Y.1996) (plaintiff who was "released immediately following his appearance" before the arraignment judge could not assert a malicious prosecution claim under the Fourth Amendment); *Subirats v. D'Angelo*, 938 F.Supp. 143, 149 (E.D.N.Y.1996) (holding that incurring legal expenses in defending a criminal prosecution is not a sufficient constraint under the Fourth Amendment to sustain a § 1983 malicious prosecution claim); *Niemann*, 911 F.Supp. at 656 (plaintiff who was not subject to travel restriction and did not have to post bail was not "seized" in her person); *Williams*, 905 F.Supp. at 1512 (holding that plaintiff's complaint that "the malicious filing of criminal charges subjected him to financial and emotional burdens in mounting a legal defense and required him to stand trial for two days" is not a sufficient deprivation of liberty under the Fourth Amendment)).

Like *Torres II*, the pretrial "restraints" on Gallo's liberty here included having to sign a bond and having to appear in federal court for his arraignment and trial. Unlike *Torres II*, Gallo was prohibited from traveling beyond the Commonwealth and New Jersey. The question before us is therefore whether this difference is of constitutional significance under the Fourth Amendment.[7]

The Second Circuit last month addressed this very issue in *Murphy v. Lynn*, 118 F.3d 938 (2d Cir. 1997). In *Lynn*, a divided panel

of the court of appeals held that a criminal defendant who could not "leave the State of New York" and had been required to "attend court appointments" had suffered a pretrial "'seizure' within the meaning of the Fourth Amendment" such that he could assert a § 1983 malicious prosecution. *Id.* at 945. The holding in *Lynn* was based on three legal conclusions, none of which we find compelling and none of which we will follow.

First, Judge Kearse, writing for the panel, recognized that although the "roots [of the right to travel] have never been identified with particularity," *id.* at 945, *Gerstein v. Pugh* "made plain that the liberties protected by [the Fourth] Amendment included the accused's freedom to travel while on pretrial release." *Id.* at 945. Judge Jacobs, dissenting in part, noted however that:

> [T]he way in which *Gerstein* supposedly makes this "plain" is that *Gerstein* cites the (now-repealed) 18 U.S.C. § 3146(a)(2) to illustrate the "burdensome conditions that may effect a significant restraint on liberty." [*Lynn*, 118 F.3d at 945]. True, the conditions of release listed in § 3146(a)(2) include restrictions on travel, but that subsection also lists restrictions on "place of abode," a category that includes home detention, which may well amount to seizure under the Fourth Amendment. There is no way to tell whether the Supreme Court intended to classify travel restriction as a 'burdensome condition,' but I do not agree that citation to § 3146(a)(2) in *Gerstein* settles the issue or 'makes plain' much of anything.

*Lynn*, 118 F.3d at 953–54; *see also Gerstein*, 420 U.S. at 125 n. 26, 95 S.Ct. at 869 n. 26 (holding that the "key factor" in determining when a restraint on liberty requires "a prior probable cause determination" is whether it is a "significant restraint on liberty"); *Torres*

---

cious prosecution claim based on his post-trial seizure. *See Torres II*, 966 F.Supp. at 1364.

**7.** The Supreme Court has recognized a right to travel in various contexts, but the precise constitutional authority for this "right" remains elusive. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618, 629, 89 S.Ct. 1322, 1328–29, 22 L.Ed.2d 600 (1969) (expressly declining to ascribe the source of the right to interstate travel to any particular constitutional provision but rather re-

lying on "constitutional concepts of personal liberty"); *Lutz v. City of York*, 899 F.2d 255 (3d Cir.1990) (canvassing Supreme Court precedents in this area). Given *Albright's* clear ruling that a malicious prosecution claim cannot be asserted under the Fourteenth Amendment and tentative suggestion that such a claim may find a home in the Fourth Amendment, we are concerned here only with determining whether there is a right to travel under the Fourth Amendment.

*II*, 966 F.Supp. at 1362 (concluding that Justice Ginsburg's "continuing seizure" theory was contrary to *Gerstein* ).

In addition to citing *Gerstein* in support of the panel's holding, Judge Kearse drew support from the concurrences and dissent in *Albright*, where one of the pretrial release conditions imposed had been that the petitioner Albright could not leave the State of Illinois. Despite recognizing that the Supreme Court in *Albright* specifically declined to address the Fourth Amendment implications, if any, of the pretrial restriction of Albright's "constitutional right to interstate travel," 510 U.S. at 275 n. 7, 114 S.Ct. at 814 n. 7, Judge Kearse cited Justices Ginsburg's and Souter's concurrences and Justice Stevens's dissent for the proposition that "the imposition of restrictive conditions of release [such as confinement to one's state] constitutes a seizure within the meaning of the Fourth Amendment." 118 F.3d at 945–46. For the reasons we canvassed in *Torres II*, 966 F.Supp. at 1360–64 & *see also supra*, we respectfully part company with our colleagues in New York when drawing guidance from Justice Ginsburg's concurrence. *See Riley v. Dorton*, 115 F.3d 1159, 1162 (4th Cir. June 16, 1997) ("A review of the Supreme Court's basic jurisprudence reinforces our refusal to adopt [Justice Ginsburg's] 'continuing seizure' theory of the Fourth Amendment."); *see also Thompson v. Whitman*, 85 U.S. (18 Wall) 457, 471, 21 L.Ed. 897 (1873) ("A seizure is a single act, and not a continuous fact.").

Finally, *Lynn* also implicitly draws comfort from the Restatement (Second) of Torts view of what constitutes confinement for purposes of the tort of false imprisonment. Comment b of § 36 of the Restatement (Second) of Torts instructs as follows:

> The area within which another is completely confined may be large and need not be stationary. Whether the area from which the actor prevents the other from going is so large that it ceases to be a confinement within the area and becomes an exclusion from some other area may depend upon the circumstances of the particular case and be a matter for the judgment of the court or jury.

Consequently, a person, according to the Restatement, may be confined to a city, *see id.* § 36, illustration 6; *Helstrom v. North Slope Borough*, 797 P.2d 1192 (Alaska 1990); *Allen v. Fromme*, 141 A.D. 362, 126 N.Y.S. 520 (1910), a state, *see* Restatement (Second) of Torts § 36, illustration 6; *Lynn*, 118 F.3d at 945–46, or even the "rest of the habitable world" outside the United States, *see* § 36, illustration 6. Whatever may be the wisdom of the Restatement's view of the matter under the common law, it only informs, but hardly dictates, the constitutional right at issue, and thus we choose not to import its suggestion into the constitutional domain. *See Siegert v. Gilley*, 500 U.S. 226, 233, 111 S.Ct. 1789, 1793–94, 114 L.Ed.2d 277 (1991); *Singer*, 63 F.3d at 116 ("The Supreme Court has recognized that, '[i]n some cases, the interests protected by a particular branch of the common law of torts may parallel closely the interests protected by a particular constitutional right'; still it is only the violation of the constitutional right that is actionable and compensable under § 1983." (quoting *Carey v. Piphus*, 435 U.S. 247, 258, 98 S.Ct. 1042, 1049, 55 L.Ed.2d 252 (1978))); *Albright*, 975 F.2d at 346; *Torres II*, 966 F.Supp. at 1361 n. 7.

We instead agree with the holding in *Albright v. Oliver*, 975 F.2d 343 (7th Cir.1992), where a unanimous panel of the Seventh Circuit dismissed Albright's § 1983 claim because, the Court of Appeals concluded, having to remain in one's home state as a condition of one's pretrial release does not constitute a "seizure" under the Fourth Amendment. Judge Posner, writing for the panel, reasoned that, while Albright "was, it is true, 'confined' to Illinois; and if Denmark was a dungeon to Hamlet (as the latter claimed), we suppose Illinois could be a prison to Kevin Albright," *id.* at 346, the arrestee's confinement to the entire state did not constitute a "seizure" under the Fourth Amendment. *See id; see also Lynn*, 118 F.3d at 953 (Jacobs, J., dissenting in part) ("[I]n my view, a person who is free to come and go in his own town and state cannot be said to be 'seized' within the meaning of the Fourth Amendment.").

We find that being confined to Pennsylvania and New Jersey—a land area much larger than Denmark[8]—did not constitute a pretrial "seizure" under the Fourth Amendment,[9] and thus, absent any constitutionally-significant pretrial restraints on Gallo's liberty, we find that he may not maintain a § 1983 claim for malicious prosecution based on the few months between his arraignment and acquittal. *See Torres II*, 966 F.Supp. at 1364; *see also Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2694–95, 61 L.Ed.2d 433 (1979) ("The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed, for every suspect released."). Whether Gallo has any evidence to make out the common law elements of a malicious prosecution claim is of no moment because Gallo suffered no constitutional deprivation sufficient to assert a § 1983 malicious prosecution claim. *See Torres II*, 966 F.Supp. at 1361 n. 7; *see supra* n. 4.[10]

---

**8.** To be exact, 3.19 times larger. *See* 1997 *Rand McNally Commercial Atlas & Marketing Guide* 480 (Pennsylvania, 45,310 sq. mi.), 420 (New Jersey, 7,790 sq. mi.) and *Brittanica Atlas* 297 (1994) (Denmark, 16,638 sq. mi.).

**9.** Furthermore, there is no evidence to suggest that Gallo ever even sought to exercise his right to request that his pretrial bail conditions be modified so as to permit him to travel beyond Pennsylvania and New Jersey. *See* 18 U.S.C. § 3145. On this point, we cannot possibly improve on Judge Posner's trenchant observations in *Albright*:

> The element of confinement was further attenuated here by the fact that Albright could leave Illinois if he obtained leave of court. As he did not feel sufficiently restive . . ., to request that leave, we do not think he was 'confined' to the point of being deprived of constitutional liberty. If you close a person in the room but the person has a key (and knows it), you have not committed false imprisonment. A *fortiori* you have not deprived him of his constitutional

liberty. The analogy is not exact, but suppose you told a person that you had locked the door but would open it as soon as he wanted to leave, provided he asked for it politely—and he never asked, or made any motion to leave. Would *that* be false imprisonment? Who knows? But it would not be a sufficient deprivation of liberty to actuate constitutional remedies.

*Albright*, 975 F.2d at 346 (citing Restatement (Second) of Torts § 36(2) & ct. a, illustration 1); *see also Wright v. Wilson*, 1 Ld. Raym. 739, 91 Eng. Rep. 1394 (1699) (basis of illustration 1 in § 36 of the Restatement).

**10.** This case hangs in this Court by the thread of an as—yet unchallenged claim, made as part of Gallo's last count, that there was a violation of civil RICO here, We will afford the defendants thirty days to file summary judgment motions on this last federal claim, and stay all discovery on the state law claims in the meantime, as those claims are before us only by virtue of 28 U.S.C. § 1367.