# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-1015

_____

| | | |
|---|---|---|
| Thomas Moran, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | |
| Anne-Marie Clarke; Robert Haar; | * | Appeal from the United States |
| Wayman F. Smith, III; Jeffery Jamison; | * | District Court for the Eastern |
| Clarence Harmon, comprising the | * | District of Missouri. |
| Board of Police Commissioners | * | |
| of the City of St. Louis; Ronald | * | |
| Henderson; Paul M. Nocchiero; | * | |
| Gregory Hawkins: Al Klein; Willie | * | |
| Thirdkill; Jack Huelsmann; William | * | |
| Kusmec; William Swiderski; Richard | * | |
| Booker, Jr.; Terrence DuPree; Barry | * | |
| Greene; Steven Petty; Harvey Laux, | * | |
| | * | |
| Appellees. | * | |

_____

Submitted: September 13, 2001

Filed: July 5, 2002 (Corrected 7/23/02)

_____

Before WOLLMAN,[1] Chief Judge, MCMILLIAN, BOWMAN, BEAM, LOKEN, HANSEN,[2] MORRIS SHEPPARD ARNOLD, MURPHY, BYE, and RILEY, Circuit Judges.

_____

BEAM, Circuit Judge.

Thomas Moran, a St. Louis police officer, sued the St. Louis Board of Police Commissioners ("the Board" or "Board") along with various police officials and officers, alleging malicious prosecution and violation of his substantive due process rights. After the plaintiff presented his case to a jury, the defendants made a motion for judgment as a matter of law, which motion the trial court granted. Moran now appeals the district court's adverse judgment, along with various evidentiary and discovery rulings and the district court's denial of his motion for recusal. This matter was previously heard and decided by a three-judge panel, Moran v. Clarke, 247 F.3d 799 (8th Cir.), vacated and reh'g granted by 258 F.3d 904 (8th Cir. 2001), and now comes before the court sitting en banc. Once again, we find the district court erred in awarding judgment as a matter of law. We reverse and remand for a new trial, and for reconsideration of certain of the evidentiary, discovery and recusal rulings.

## I. BACKGROUND

This action represents the end product of a series of tragic events. Given the district court's disposition of this case, we state the facts in a light most favorable to Moran, assume the truth of his evidence, and draw all reasonable inferences in his favor. Otting v. J.C. Penney Co., 223 F.3d 704, 708 (8th Cir. 2000).

_____

[1]The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002. He has been succeeded by the Honorable David R. Hansen.

[2]The Honorable David R. Hansen became Chief Judge of the United States Court of Appeals for the Eighth Circuit on February 1, 2002.

On April 14, 1997, St. Louis police officers Richard Booker and Steven Petty responded to a report of a burglar alarm at a private residence. Inside the apartment, the officers encountered Gregory Bell, a mentally-impaired teenager. Bell's impairment prevented him from providing the proper alarm code or explaining to the officers that he lived there. Thinking him a burglar, the officers attempted to place Bell under arrest. Bell resisted. During the ensuing fight, the officers repeatedly struck him with metal batons and sprayed him with mace. During the struggle, one of the officers placed an "officer in need of aid" call.

At that time, Sergeant Moran was on duty at a police substation. With him were emergency medical technicians Mark Rauss and Larry Campbell. When the "officer in need of aid" call came in, Moran immediately headed to the scene. Anticipating their own call, Rauss and Campbell also responded. When Moran reached the scene, ten to thirteen police cars already blocked the street. Moran had to park far down the street and walk back to the residence. Meanwhile, some combination of responding officers eventually subdued Bell. After he ceased resisting, Bell was brought from the house in handcuffs. Dispatcher and 911 tape recordings indicate that Moran did not arrive at the house until after Bell had been subdued. After Moran arrived on the scene, he entered the house and encountered Bell as he was being removed from the premises. Rauss and Campbell treated Bell from the moment he was brought outside until the time he was transported from the scene. According to Rauss, Moran did not use mace on Bell during that period. The incident left Bell with severe lacerations to the head and a broken ankle. There is substantial evidence that throughout this course of events, Moran neither struck nor used mace upon Gregory Bell.

Within seventy-two hours of the incident, Police Chief Ronald Henderson publicly acknowledged that a mistake had been made and committed himself to punishing wrongdoers. On April 19th, the Saturday following the beating, Major Hawkins, the Inspector of Police, received an anonymous phone call informing him that Officer Barry Greene had been at the scene and wanted to make a statement.

-3-

Ordinarily, internal investigations within the St. Louis Police Department are handled by the Internal Affairs Division ("IAD") and Chiefs of Police are rarely involved. In this case, however, Major Hawkins, Chief Henderson and Captain Nocchiero, the IAD director, met with Officer Greene that evening in Henderson's office, while the assigned IAD investigators, Sergeants Thirdkill and Klein, were never notified. Officer Greene gave a taped statement accusing Sergeant Moran of striking Bell. None of the participants asked Greene a single question. The record indicates that Greene gave two statements, the first of which did not implicate Moran, and which was not recorded.

Shortly after hearing Officer Greene's Saturday night statement, and while IAD was still interviewing officers, Chief Henderson took Officer Greene, Major Hawkins, Captain Nocchiero and Sergeants Thirdkill and Klein to speak with Dee Joyce-Hayes, Circuit Attorney for the City of St. Louis, to report Moran's alleged wrongdoing. Henderson did this despite the fact that at that time no statement of any other officer at the scene had implicated Moran.

In the wake of the beating, IAD had begun interviewing individuals involved, and ultimately interviewed approximately fifteen officers. Among those interviewed were Officers Petty and Booker, both of whom waived their Miranda rights and gave statements. At trial, Moran established that St. Louis officers in such a situation, facing potential criminal charges of their own, usually do not waive their rights. Booker testified that "[i]f I waive my rights, I feel basically I'm not being pursued criminally."

After the first round of interviews, no other officer had corroborated Officer Greene's allegation. IAD then began calling officers back for repeated rounds of additional interviews. In these interrogations, IAD told the officers they were looking for "the truth." Curious about IAD's conduct, Richard Barry and Andrew Leonard, the attorneys representing the various officers, including Moran, inquired of Captain Nocchiero what IAD thought was "the truth." Nocchiero said that he could not

-4-

answer the question, and then walked out of his office. He returned shortly, and ushered the two attorneys into Chief Henderson's office. Concerned with potential conflicts of interest, Barry asked Chief Henderson who he wanted. Chief Henderson stated, "I want the sergeant." Barry then asked, "which sergeant?" According to Barry, Henderson replied "the white sergeant." Barry and Leonard were certain that Henderson was focusing on Moran. Leonard was convinced that Chief Henderson was driving the internal investigation. Henderson made clear to the attorneys that officers changing their statements would not lose their jobs based on any inconsistencies with their first statements.

Among those interviewed was Officer Terrence DuPree. DuPree had been present at the Bell beating, and had afterwards corroborated Booker's report on the incident, purportedly encouraged to do so by Moran. When recalled for subsequent interviews, DuPree was working the "overlay" shift, which runs from 6:00 p.m. to 2:00 a.m. Almost every morning for a week, after finishing his shift, he was required to report to IAD, where he was left to sit without being interviewed by anyone, at times while his attorney spoke with Chief Henderson and IAD officers. Having seen Chief Henderson's statement to the media–which occurred prior to completing the investigation–Officer DuPree knew that the Department had committed itself to punishing a wrongdoer. In this regard, DuPree, who testified he had been at the scene, expressed concern to his wife regarding Chief Henderson's vow to punish wrongdoers. He further testified that this caused him personal concern. He also got the strong impression through the "rumor mill" that the Department was after Moran. DuPree again spoke with IAD on May 8, 1997. At trial, DuPree testified that on that date he enhanced his initial statement for fear of losing his job. In that May 8 statement, DuPree implicated Moran in striking Bell with his ASP baton, but also stated that Moran had not acted with improper or excessive force.

After receiving Officer DuPree's May 8th statement, Chief Henderson suspended Moran without pay. Moran was ultimately formally accused of having assaulted Bell by striking him with an ASP baton and by spraying mace in his face,

both after Bell had ceased resisting.  On May 16, 1997, the Metropolitan Police Department Bureau of Professional Standards charged Moran with assault, use of excessive force with an ASP baton, and use of excessive force with mace.  Chief Henderson and Major Hawkins signed off on these administrative charges.  On June 5, 1997, Moran was indicted by a grand jury on criminal charges of felony assault, misdemeanor assault and conspiracy to hinder prosecution.  Moran was allowed to voluntarily surrender himself to the police department and was arrested.  After booking, he was released.

The charges against Moran were assigned to Assistant Circuit Attorney Douglas Pribble.  After reviewing the evidence, Pribble wrote a memorandum[3] to Circuit Attorney Joyce-Hayes which detailed the inconsistencies between the various officers' statements, thoroughly discredited Greene's statements, and demonstrated how the evidence not only failed to build a case against Moran, but in fact tended to exonerate him. The prosecution proceeded, and Pribble subsequently left the circuit attorney's office.

In May of 1998, a jury acquitted Moran of all criminal charges.  On May 22, 1998, the St. Louis Post-Dispatch reported that the Police Department had reached a $250,000 settlement with the Bell family.  The paper reported it believed this to be the largest settlement ever paid by the Department.  On May 18, 1998, one year after the Bureau of Professional Standards had first filed its administrative charges against Moran, and two weeks before his administrative hearing, a fourth charge of failure to properly exercise his duties as a police sergeant was added against him.  This additional charge was also authorized by Major Hawkins and Chief Henderson.

Moran's administrative hearing occurred on June 4 and 5, 1998, and July 14, 15, 16, 28, 29 and 31, 1998.  At this hearing, several witnesses favorable to Moran

_____

[3]Although the trial court excluded this memorandum from evidence, its contents were broadly discussed at trial.

-6-

who had testified for him at his criminal trial asserted their Fifth Amendment privilege and declined to testify. They did so because shortly before the hearing began they had been informed that they were the targets of additional internal procedures. The hearing officer ultimately recommended acquittal on the assault and excessive force charges. However, he recommended sustaining the fourth charge on the grounds that Moran directed Booker to file a false report regarding the Bell beating. The Board of Police Commissioners accepted the first three recommendations. The Board also accepted the fourth recommendation but sustained the charge on wholly different grounds. The Board concluded that while it could not tell who beat Gregory Bell, or when or how, it was certain that some beating occurred after Bell had been subdued. The Board further concluded that Moran had been in charge at that time. The Board therefore found Moran guilty of failure to properly exercise his duties by failing to prevent the purported illegal beating. As punishment, the Board enforced the earlier suspension without pay and demoted Moran. As provided under Missouri law, Moran appealed this process to the Missouri Circuit Court for the City of St. Louis which affirmed the Police Board's action.

In late 1998 and early 1999, the Department meted out suspensions of one to five days to various officers for conduct related to the Bell incident, including failure to report misconduct, false reporting, and improper performance of duty. No officer, however, was ever punished for assaulting Bell.

Moran sued the defendants under 42 U.S.C. § 1983, alleging that they conspired to and did violate his right to substantive due process under the Fourteenth Amendment. He also alleged a state law malicious prosecution claim. This litigation does not revisit his acquittal of criminal wrongdoing. Rather, it questions the defendants' investigation into Moran's conduct, and the ensuing criminal and administrative procedures and prosecutions.

Prior to trial, Moran was denied numerous items of discovery under assertions of privilege. Both prior to and at trial, the district court excluded various items of

-7-

evidence Moran sought to or did offer. After presentation of Moran's case, as earlier indicated, the district court granted defendants' motion for judgment as a matter of law. Moran now appeals these rulings. He also appeals the district court judge's refusal to recuse himself after Moran discovered that the district court judge had a close social relationship with one of the named defendants.

## II.    DISCUSSION

### A.    Substantive Due Process

We start with the district court's disposition of this case. A district court may grant a motion for judgment as a matter of law once a party has been fully heard on an issue if the party has failed to establish any legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue. Fed. R. Civ. P. 50(a)(1). Such a ruling is appropriate only "when all the evidence points one way and is susceptible of no reasonable inferences sustaining the position of the non-moving party." Ehrhardt v. Penn Mut. Life Ins. Co., 21 F.3d 266, 269 (8th Cir. 1994) (quotation omitted). We review a grant of a judgment as a matter of law de novo. Heintzelman v. Runyon, 120 F.3d 143, 145 (8th Cir. 1997). In doing so we do not weigh the evidence, but draw all factual inferences in favor of the nonmoving party. Lytle v. Household Mfg., Inc., 494 U.S. 545, 554 (1990).

Moran alleged that the defendants conspired to and did violate his federally secured rights in violation of 42 U.S.C. § 1983. The Fourteenth Amendment guarantees "[s]ubstantive due process[, which] prevents the government from engaging in conduct that shocks the conscience or interferes with rights implicit in the concept of ordered liberty." Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc). To that end, the Fourteenth Amendment prohibits "conduct that is so outrageous that it shocks the conscience or otherwise offends 'judicial notions of fairness, [or is] offensive to human dignity.'" Id. (quoting Weimer v. Amen, 870 F.2d 1400, 1405 (8th Cir. 1989)) (alteration in original). Moran also alleged a malicious

prosecution claim, which arises under Missouri law upon a showing that a defendant initiated or continued a prosecution without probable cause.  King v. Ryals, 981 S.W.2d 151, 154 (Mo. Ct. App. 1998).  The district court acted correctly only if the evidence Moran introduced , viewed in a light most favorable to him, failed to create any legally sufficient evidentiary basis for a reasonable jury to find for him on any of his claims.  See Lytle, 494 U.S. at 554-55.  After a thorough review of the record, we find the district court erred.[4]

"In determining whether a substantive right protected by the Due Process Clause has been violated, it is necessary to balance 'the liberty of the individual' 'and the demands of an organized society.'"  Youngberg v. Romeo, 457 U.S. 307, 320 (1982) (citations omitted).  Whether a substantive due process right exists is a question of law.  See id. at 321 (stating that "[i]f there is to be any uniformity in protecting [individuals' liberty interests and relevant state interests], . . . balancing [of the plaintiff's liberty interests against the relevant state interests] cannot be left to the unguided discretion of a judge or jury").  However, subject to certain presumptions, whether the plaintiff has presented sufficient evidence to support a claimed violation of a substantive due process right is a question for the fact-finder, here the jury.  Cf. id. at 324-25.

We concede that some of our previous cases may not have discussed with sufficient clarity the consideration to be given the various elements of a substantive

---

[4]The district court entertained only the briefest of oral arguments on the defendants' motion before granting it.  The district court apparently wrapped the malicious prosecution claim and the section 1983 claim together, hearing argument only as to the former, yet applying the same standard to both.  In a one-page order, the district court, without explanation, dismissed all of Moran's claims. As a matter of procedure, the district court should have articulated grounds for this decision.  See Dominium Mgmt. Servs. Inc. v. Nationwide Housing Group, 195 F.3d 358, 366 (8th Cir. 1999).

claim. Fortunately, we are also guided by more recent Supreme Court precedent as we decide this dispute.

The facets of our endeavor do not occur in isolation. As we have recognized, to decide this appeal, we must weigh "the individual's interest in liberty against the State's asserted reasons for restraining individual liberty." Youngberg, 457 U.S. at 320. At the outset, we identify the individual liberty interests at stake and the established demands of an organized society at issue. See id. at 321; see also Albright v. Oliver, 510 U.S. 266, 271 (1994) (plurality opinion of Rehnquist, C.J.). We then analyze, qualitatively, whether the interests asserted are sufficiently important for substantive due process consideration. Ultimately, within this context, we assess whether the government's contested actions are conscience shocking. See County of Sacramento v. Lewis, 523 U.S. 833, 849 (1998) (plurality opinion of Souter, J.) .

The Supreme Court has "always been reluctant to expand the concept of substantive due process." Collins v. City of Harker Heights, 503 U.S. 115, 125 (1992). The Court also "exercise[s] the utmost care whenever . . . asked to break new ground in this field." Washington v. Glucksberg, 521 U.S. 702, 720 (1997) (quotations omitted). Still, the Supreme Court has, nonetheless, as noted by Judge Richard Sheppard Arnold in his well reasoned dissent in Singleton v. Cecil, 176 F.3d 419, 431-32 (8th Cir. 1999), occasionally recognized a new liberty interest or expanded, at least marginally, an existing right.

Although some precedent at least implies that even minor interests may be actionable if government conduct is sufficiently arbitrary and outrageous, see, e.g., City of Chicago v. Morales, 527 U.S. 41, 53 (1999) (stating that "the freedom to loiter for innocent purposes is part of the 'liberty' protected by the Due Process Clause of the Fourteenth Amendment"); BMW of North America, Inc. v. Gore, 517 U.S. 559, 599 (1996) (Scalia, J., dissenting) (indicating that the majority had identified "a 'substantive due process' right against a 'grossly excessive' award"), we need not

answer that question today. Here, we deal with fundamental rights and interests specifically identified by the Supreme Court.

Chief Justice Rehnquist, speaking in Glucksberg, states that "[t]he Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint." 521 U.S. at 719 (citing Collins, 503 U.S. at 125). "The Clause also provides heightened protection against government interference with certain fundamental rights *and* liberty interests." Id. at 720 (emphasis added). The Chief Justice notes that, in addition to the specific freedoms protected by the Bill of Rights, the "liberty" specially protected by the Due Process Clause includes certain court-recognized fundamental rights.[5]

Judge Arnold points out in Singleton, that the Supreme Court in Meyer v. Nebraska, 262 U.S. 390, 399 (1923), acknowledged a fundamental interest inherent in the right to engage in any of the common occupations of life. 176 F.3d at 431. He then notes Cafeteria and Restaurant Workers Union, Local 473 v. McElroy, 367 U.S. 886 (1961), in this regard, wherein the plaintiff, a short-order cook, "was not deprived of anything beyond that particular job, but all nine members of the [Supreme] Court were nevertheless agreed that she was protected, in the substantive sense, from conduct that was patently arbitrary." Singleton, 176 F.2d at 432.

---

[5]By way of illustration, he listed the right to marry, Loving v. Virginia, 388 U.S. 1 (1967); to have children, Skinner v. Oklahoma, 316 U.S. 535 (1942); to direct the upbringing and education of one's children, Meyer v. Nebraska, 262 U.S. 390 (1923); to marital privacy, Griswold v. Connecticut, 381 U.S. 479 (1965); to use contraception, id.; to bodily integrity, Rochin v. California, 342 U.S. 165 (1952); to abortion, Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833 (1992); and, perhaps, the right to refuse unwanted medical treatment, Cruzan v. Director, Missouri Dep't of Health, 497 U.S. 261 (1990). Glucksberg, 521 U.S. at 720.

-11-

Moran offers evidence that he was investigated, prosecuted, suspended without pay, demoted and stigmatized by falsely-created evidence and other defamatory actions of the defendants. The Supreme Court has held that an individual has a right in the course of employment to be free from an employer's stigmatizing conduct, at least without an opportunity for a name-clearing response, Board of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972), and, also, as just noted, to engage, without unreasonable interference and harassment, in any of the common occupations of life, Meyer, 262 U.S. at 399. We believe this includes police work–indeed, perhaps, specific police work. See, e.g., McElroy, 367 U.S. at 896; see also Winegar v. Des Moines Indep. Cmty. Sch. Dist., 20 F.3d 895, 900 (8th Cir.) (indicating that an employee can have a protected interest in a benefit, such as a particular assignment or duty station, if he legitimately expects to continue in that assignment), cert. denied, 513 U.S. 964 (1994).

Perhaps more importantly, according to the evidence, the adverse employment actions may have been undertaken by the defendants, at least in part, because Moran is white. Equal protection is, of course, one of the fundamental freedoms specifically protected by the Bill of Rights. U.S. Const. amend. XIV, § 1. Singling out an individual for investigation or punishment because of race is suspect. See, e.g., Regents of the University of California v. Bakke, 438 U.S. 265, 305, 307 (1978) (stating that "[w]hen a classification denies an individual opportunities or benefits . . . because of his race . . . it must be regarded as suspect," and that "[p]referring members of any one group for no reason other than race . . . is discrimination for its own sake"). In order to justify use of a suspect classification, such as race, the government must show that its purpose is both constitutionally permissible and that use of the classification is necessary to safeguard its interest. Id. at 305.

The record on appeal does not clearly set forth the race of the various parties and participants, including the police officers who were more clearly involved in the striking of Mr. Bell but who were penalized, at most, by the imposition of one- to five-day suspensions. However, these details may have been obvious to the jury as

the various parties and witnesses appeared at trial. This information, if available to the fact-finder, may prove to be relevant in the balancing of individual interests against the demands of organized society.

Although Glucksberg involved legislative action, we are also guided by Justice Kennedy's concurring opinion in Lewis–a concurrence apparently necessary for a court majority on the plurality's holdings on actionable interests. There, Justice Kennedy, joined by Justice O'Connor, dealt with executive action and noted that an "interest protected by the text of the Constitution" is sufficient to support substantive due process analysis. Lewis, 523 U.S. at 856 (plurality opinion of Kennedy, J.). We are, therefore, comfortable in holding that the interests asserted by Moran are sufficient to support substantive inquiry.

However, before proceeding further, we must also consider the principle that if "'a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" Lewis, 523 U.S. at 842 (plurality opinion of Souter, J.) (quoting Albright, 510 U.S. at 273 (plurality opinion of Rehnquist, C.J.)). In Albright, a plurality of the Court determined there was no substantive due process right arising from malicious prosecution, but did not rule out the possibility of bringing such claims under the auspices of the Fourth Amendment. 510 U.S. at 271, 274-75. However, in Lewis, a plurality pointed out that:

> [Not] all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments; rather, [relevant precedent] simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process.

-13-

523 U.S. at 843 (quotations and citation omitted). Accordingly, when a person is damaged by outrageous police misconduct but the resulting injury does not neatly fit within a specific constitutional remedy, the injured party may, depending upon the circumstances, pursue a substantive due process claim under section 1983. See id. at 844 (citing, e.g., Evans v. Avery, 100 F.3d 1033, 1036 (1st Cir. 1996); Pleasant v. Zamieski, 895 F.2d 272, 276 n.2 (6th Cir. 1990)).

In Albright, an informant of questionable reliability misidentified John Albright, Jr., as a seller of cocaine. Albright v. Oliver, 975 F.2d 343, 344-45 (7th Cir. 1992). After the defendant detective realized that Albright was not likely to have committed the offense of which he was accused, the detective pursued Albright's sons. Id. at 344. The detective discovered that one son, John David Albright, could not have committed the offense because he was in another state at the time the informant said the crime transpired. Id. He then pursued a second son, plaintiff Kevin Albright. Id. The detective made no effort to corroborate the unsubstantiated accusation of the informant, despite the informant's initial misidentification having cast grave doubt on the accuracy of her information, and despite the fact that of fifty individuals she had accused of trafficking drugs, none had been successfully prosecuted. Id. at 345. Kevin Albright was charged and a warrant was issued for his arrest but he learned of the warrant and turned himself in to law enforcement authorities. Id. at 344. Although the Seventh Circuit acknowledged that arresting a person on such "scanty grounds . . . is shocking," id. at 345, the Supreme Court determined that such pretrial deprivations were better addressed under the Fourth Amendment and not substantive due process, 510 U.S. at 274-75.

Unlike the facts of Albright, Moran, in his due process claim, offers evidence of a purposeful police conspiracy to manufacture, and the manufacture of, false evidence. Instead of simply allowing a weakly supported prosecution to proceed, Moran correctly asserts that the evidence can be read to show acts designed to falsely formulate a pretense of probable cause. Although the Fourth Amendment covers seizures, which would be satisfied by Moran's arrest, law enforcement's intentional

creation of damaging facts would not fall within its ambit.  Cf. Albright, 510 U.S. at 274-75;  Rogers v. City of Little Rock, 152 F.3d 790, 796 (8th Cir. 1998) (stating that the violation there was "different in nature from one that [could] be analyzed under the fourth amendment reasonableness standard" because "[n]o degree of sexual assault by a police officer acting under color of law could ever be proper").   Here, we see no specifically applicable constitutional remedy that provides Moran with explicit protection to a level sufficient to exclude substantive due process analysis.

Finally, we must consider the universe of executive abuses that shock the conscience and violate the decencies of a civilized society.  See Lewis, 523 U.S. at 846-47.  Although acts arising out of a defendant's deliberate indifference will not sustain a substantive due process claim, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id. at 849.

> In striking the substantive due process balance, the question "is not simply whether a liberty interest has been infringed but whether the extent or nature of the [infringement] . . . is such as to violate due process." It is a question of degree.  In general, substantive due process "is concerned with violations of personal rights . . . so severe . . . so disproportionate to the need presented, and . . . so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience."

In re Scott County Master Docket, 672 F. Supp. 1152, 1166 (D. Minn. 1987) (alterations in original) (citations omitted).

At first glance, it might appear that the demands of an organized society in this case would list toward the serious business of weeding out police abuses like those of which Moran was accused.  Thwarting and punishing police brutality certainly weighs heavily and lies at the heart of our system of justice, if it is indeed to be one of meting out justice.  However, here the substantive due process claim alleges

-15-

actions not based on so pure a motive. Accordingly, we are prompted to weigh Moran's constitutionally important liberty interests against evidence that officials purposely conspired to manufacture evidence in order to make him an innocent scapegoat for a devastating travesty that embarrassed the police department and its managers, and evidence that the executive actions may have been partially undertaken to protect other, more favored, employees in the department.

Viewing the record in the appropriate light, Moran established a plausible case for each of his contentions. He introduced evidence that tends to show a police department that publicly and financially committed itself to producing a culprit for an alleged wrongdoing before any such wrongdoing was actually established. He produced proof of questionable procedures, of pressures placed on officers to incriminate a specific person or corroborate the department's official line, of a hasty condemnation of Moran and of improper consideration of his race. Moreover, he offered proof that, at various times, certain defendants purposely ignored evidence that strongly tended to exonerate him. In short, drawing all inferences in his favor, a reasonable jury could conclude that some or all of the defendants intentionally set up an innocent Moran for patently arbitrary reasons.

On the other hand, it may well be that learning of a brutal beating, Chief Henderson drew a reasonable conclusion that wrongdoing had occurred, and that under the circumstances, given Barry Greene's statement, and facing a "blue wall of silence," the Chief and IAD acted reasonably. A jury might also conclude that treatment of DuPree was reasonable under the circumstances, that he was not pressured to implicate Moran, and that his concern was self-imposed. It may also be that many of the operative decisions lay not in the hands of the defendants but with the prosecuting attorney. Such questions, however, along with whether a hint of probable cause existed, depend on interpretation of the evidence, the drawing of inferences and evaluation of witness credibility. These remain the province of the jury. Accordingly, we remand for a new trial. See Youngberg, 457 U.S. at 325.

**B.      Recusal**

We turn next to the recusal question.  At her deposition, Board member Anne-Marie Clarke disclosed that she and the district court judge know each other socially. She admitted having known the judge for over twenty-one years.  She testified that over the years they had visited one another's homes on various occasions.  Clarke also testified that she, the district judge, and her co-defendant Wayman Smith appeared at the same social events. Given these discoveries, Moran made a motion for recusal, which the district court denied without comment.  Moran appeals this decision.

We commit the recusal decision to the sound discretion of the district court, and review that decision only for abuse of discretion.  In re Kansas Pub. Employees Retirement Sys., 85 F.3d 1353, 1358 (8th Cir. 1996) [hereinafter In re KPERS].  A judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  28 U.S.C. § 455(a).  This restriction is intended to "promote public confidence in the integrity of the judicial process."  Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 859-60 (1988).  Whether a judge actually has a bias, or actually knows of grounds requiring recusal is irrelevant–section 455(a) sets an objective standard that does not require scienter.  Id. at 859-60.  We have recast the issue as "whether the judge's impartiality might reasonably be questioned by the average person on the street who knows all the relevant facts of a case."  In re KPERS, 85 F.3d at 1358.

By enacting section 455(a), Congress sought to eradicate not only actual, but also the appearance of impropriety in the federal judiciary.  See Liljeberg, 486 U.S. at 860.  To that end, Congress permitted parties to waive such ground for disqualification after full disclosure on the record. 28 U.S.C. § 455(e). Thus, where judges have fully disclosed potential conflicts and have then retained their mandate in a case, we have been solicitous of their discretion.  In In re KPERS, for instance, the district court immediately informed the parties when a potential conflict arose, and disqualified himself from a decision involving those parties.  85 F.3d at 1355.

-17-

Moreover, knowing of potential conflicts, the parties passed up opportunities to object. Id. at 1356. There, we affirmed the district court judge's refusal to recuse himself. Id. at 1358.

It is true that "[a]n unfavorable judicial ruling . . . does not raise an inference of bias or require the trial judge's recusal." Harris v. Missouri, 960 F.2d 738, 740 (8th Cir. 1992) (declining to accept judge's refusal to accept a plea agreement as evidence of bias); accord Holloway v. United States, 960 F.2d 1348, 1350-51 (8th Cir. 1992) (holding that granting a reduced sentence to one but not another defendant, and being friends with another judge who allegedly "harbored a bias" against defendant, were not grounds for finding bias). However, the inquiry whether a reasonable person, knowing all the relevant facts, would discern potential impropriety certainly warrants consideration of a judge's course or pattern of rulings, and also of the judge's course of conduct.

We are troubled by the record in this case. The district judge's appearances at the same social events as Clarke and Smith brooks little mention. Judges, attorneys and public officials will often share public appearances. This does little to create the appearance of impropriety. The social relationship, however, invites more scrutiny. The image of one sitting in judgment over a friend's affairs would likely cause the average person in the street to pause. That the judge and Clarke enjoyed a friendship of sufficient depth and duration as to warrant several reciprocal visits to one another's homes only exacerbates the problem. We find particularly worrisome the district court's failure to disclose this conflict himself, as permitted by section 455(e). Moreover, the record suggests a fractious relationship between the district court and Moran's attorneys. We do, however, have the utmost faith in the district court's ability to rule impartially, and have imposed on ourselves an obligation to reverse a district court only where we can say with certainty that it has abused its discretion. Accordingly, rather than remand to a different judge, we remand this question to the district court with the suggestion that it revisit and more thoroughly consider and respond to Moran's recusal request.

## C.    Evidentiary Rulings

Moran next appeals various evidentiary rulings.  We review a district court's evidentiary decisions for abuse of discretion.  Radecki v. Joura, 177 F.3d 694, 696 (8th Cir. 1999).  In order to warrant that review, however, a party must properly preserve an issue below with an offer of proof unless the evidence was excluded pursuant to a motion in limine.  Fed. R. Evid. 103(a).  Additionally, an issue must be presented here in a meaningfully developed manner.  Bratton v. Roadway Package Sys., Inc., 77 F.3d 168, 173 n.1 (7th Cir. 1996).

Moran appeals different exclusions with varying degrees of specificity.  Were it not for our disposition of the first issue above, we would not likely reach many of his more elliptical arguments.  However, our remand for a new trial wipes the evidentiary slate clean and permits Moran to reargue the admissibility of each item to the district court.  We therefore decline to take up each ruling separately.

We do note, though, for clarity on remand, that were we to reach Moran's arguments we would likely find error with at least some of the district court's rulings. The district court first excluded significant amounts of evidence on the basis that it ran to the issue of whether Moran was actually innocent.  We agree that evidence probative solely for that purpose would be irrelevant to the questions of whether probable cause existed for a prosecution and whether the defendants' conduct was sufficiently shocking.  However, some of the evidence the district court excluded, for instance whether Chief Henderson was ever aware of the analysis of the 911 dispatcher tape recordings, seems probative both to prove Moran's innocence and also to establish the very questions at issue in this case.  Such evidence should have been received.

The district court also excluded evidence on the grounds that it related solely to the administrative charges brought against Moran and appealed by him to the Missouri state courts.  The district court ruled that evidence relating to those charges

should be excluded because those claims were subject to a res judicata defense. As we are remanding for a new trial, the district court will also have an opportunity to revisit these rulings. We pause only to note that whether a claim is precluded in a particular instance does not dispose of the question of whether evidence relating to that claim is relevant or irrelevant to another more current dispute.

### D. Discovery Rulings

Moran also appeals the district court's refusal to order defendants to produce two types of documents–IAD investigative reports and the minutes of closed Board meetings. To protect the former, the defendants assert governmental and work product privileges. As to the latter, they assert the attorney-client privilege. Moran asserts the district court erred in sustaining these claims of privilege, or should at least have undertaken an in camera review of the purportedly privileged documents.

We review a district court's discovery rulings for abuse of discretion. Bunting v. Sea Ray, Inc., 99 F.3d 887, 890 (8th Cir. 1996). We will grant a new trial on the basis of erroneous discovery errors only where the errors "amount to a gross abuse of discretion resulting in fundamental unfairness." Id. Our review is thus both narrow and deferential. Id. We similarly rely heavily on the district court's discretion in deciding whether to conduct an in camera review. United States v. Phillips, 854 F.2d 273, 277 (7th Cir. 1988). Having reviewed the record, we cannot say that the district court abused its discretion to such a degree as to warrant a new trial. However, we have already determined that this matter should be remanded for a new trial on other grounds. As with the evidentiary rulings discussed above, the district court will be able to revisit these rulings upon Moran's motion. On appeal, however, Moran has not stated a case sufficiently compelling to persuade us that the district court committed error in not conducting an in camera review.

## III.  CONCLUSION

This matter is reversed and remanded to the district court for further proceedings consistent with this opinion.[6]

BYE, Circuit Judge, concurring.

I join the majority opinion in full.  I write simply to make explicit what I believe is implicit in the court's decision.  In Singleton v. Cecil, 176 F.3d 419, 424-25 & n.7 (8th Cir. 1999) (en banc), Riley v. St. Louis County, 153 F.3d 627, 631 (8th Cir. 1998), Weiler v. Purkett, 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc), and other cases, we confused two *elements* of a plaintiff's substantive due process claim based upon executive action with two distinct *theories* of recovery.  Our distinction can no longer be maintained in the face of the Supreme Court's most recent substantive due process decisions.

In County of Sacramento v. Lewis, the Court held that all substantive due process claims against executive officials proceed under one theory, not two separate theories.  523 U.S. 833, 847 n.8 (1998).  In every case in which a plaintiff challenges the actions of an executive official under the substantive component of the Due Process Clause, he must demonstrate *both* that the official's conduct was conscience-shocking, id., *and* that the official violated one or more fundamental rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of

---

[6]We have analyzed in detail only the federal constitutional issue.  This was done for two reasons.  The state malicious prosecution claim was considered by the district court almost entirely in the context of the federal due process claim.  See ante n.4.  Without continuing jurisdiction under 28 U.S.C. § 1331 or 1332, the district court had broad discretion to terminate the state claim.  See 28 U.S.C. § 1367(c)(3).  The district court did not reach the defendants' qualified immunity defense.  Upon remand, we direct the district court to further evaluate all claims and defenses consistent with this opinion.

ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997) (internal citations and quotations omitted); see Lewis, 523 U.S. at 847 n.8 ("Only if the necessary condition of egregious behavior were satisfied would there be a possibility of recognizing a substantive due process right to be free of such executive action, and only then might there be a debate about the sufficiency of historical examples of enforcement of the right claimed, or its recognition in other ways."); Hawkins v. Freeman, 195 F.3d 732, 738 & n.1 (4th Cir. 1999) (en banc); Morris v. Dearborne, 181 F.3d 657, 668 (5th Cir. 1999); Robert Chesney, Old Wine or New? The Shocks-the-Conscience Standard and the Distinction Between Legislative and Executive Action, 50 Syracuse L. Rev. 981, 992-93, 997-99 (2000).

The majority ably explains that Thomas Moran produced proof sufficient to avoid a directed verdict as to both elements. As to conscience-shocking government conduct, Moran "introduced evidence that tends to show a police department that publicly and financially committed itself to producing a culprit for an alleged wrongdoing before any such wrongdoing was actually established." Ante at 16. As to the fundamental rights analysis, the majority properly concludes Moran may have been deprived of important interests in his job and his good name, perhaps on the basis of his race. Ante at 11-13. I therefore join with the majority in reversing the district court's hasty decision to grant the defendants judgment as a matter of law.

RILEY, Circuit Judge, concurring.

The majority opinion, the dissent, and Judge Bye have each presented excellent reasoning for their opinions. Because I believe this difficult case should be presented to a jury for resolution, I join the judgment of the majority opinion in reversing the district court's decision.

A judgment as a matter of law is "appropriate only when all of the evidence points one way, and is susceptible of no reasonable inference sustaining the jury's

verdict." See Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 896 (8th Cir. 2002) (citation omitted).  Since I believe the district court and the dissent have weighed the evidence, made determinations based on the credibility of witnesses and not drawn all reasonable factual inferences in favor of Moran, I concur with the majority opinion's conclusions.

I further join in Judge Bye's clarification and the dissent's reasoning that a substantive due process action must prove both conscience shocking conduct by the official and that such conduct violated one or more deeply rooted, fundamental rights of our Nation.  See County of Sacramento v. Lewis, 523 U.S. 833, 846-47 & n.8 (1998).

LOKEN, Circuit Judge, with whom McMillian, Wollman, and Murphy, Circuit Judges, join, dissenting.

This case aptly illustrates the old adage, "hard cases make bad law."  Faced with a partial trial record revealing an internal investigation that wounded the career and reputation of a police officer ultimately found innocent of the most serious wrongdoing, the court concludes that the officer has viable substantive due process and malicious prosecution claims against his investigators.  I conclude, to the contrary, that the district court correctly granted defendants judgment as a matter of law at the close of Sergeant Moran's case.  Accordingly, I respectfully dissent.

## I. Substantive Due Process.

The panel reversed the district court on the ground that Moran's trial evidence raised a jury issue as to "whether the defendants' conduct was so wrongful as to shock the conscience." 247 F.3d at 805. We granted rehearing en banc because that ruling reflected two errors of law.  First, as Judge Bye's concurring opinion explains, proof that government misconduct is conscience-shocking does not suffice.  To prevail on a substantive due process claim based upon executive action, plaintiff

-23-

"must demonstrate *both* that the official's conduct was conscience-shocking . . . *and* that the official violated one or more fundamental rights that are 'deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.'" Ante pp. 21-22, quoting Washington v. Glucksberg, 521 U.S. 702, 720-21 (1997).  Second, whether the conduct was "so wrongful as to shock the conscience" is not a jury question.  To ensure that substantive due process does not become a "font of tort law," County of Sacramento v. Lewis, 523 U.S. 833, 848 (1998), the government misconduct at issue "must 'shock the conscience' of federal judges."  Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992).

**A.  Fundamental Protected Rights.**  The Supreme Court in Lewis said that "the threshold question" in a substantive due process case is whether the conduct at issue shocks the conscience.  523 U.S. at 847 n.8.  But in Lewis, plaintiffs' fundamental interest was clear -- their decedent had died in a high-speed police chase. The issue was the standard by which the pursuing police officers' conduct should be measured.  Because context is so important to due process analysis, I think it useful in this case to focus first on whether Moran has alleged the violation of a fundamental liberty interest which is "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty."

As the court appears to recognize, proper analysis of this issue must begin with a "careful description of the asserted fundamental liberty interest" at stake. Glucksberg, 521 U.S. at 721.  Moran's briefs to the panel paid no attention to this issue, relying instead on the erroneous assertion that only conscience-shocking misconduct need be proved.  We invited further briefing of the issue in our order granting rehearing en banc. Moran filed a supplemental brief again arguing that proof of conscience-shocking executive conduct, without more, establishes a substantive due process violation.  Alternatively, Moran asserted that his "fundamental constitutional liberty in his job and reputation and standing in the community . . . is sufficient to invoke substantive due process."

-24-

The difficulty with this contention is that it is contrary to controlling Supreme Court precedent. In Albright v. Oliver, 510 U.S. 266 (1994), no fewer than seven Justices agreed, though on different grounds, that a substantive due process claim will not lie for "prosecution without probable cause," id. at 271 (plurality opinion), or for "malicious initiation of a baseless criminal prosecution," id. at 281 (Kennedy, J., concurring). See also Baker v. McCollan, 443 U.S. 137, 142-46 (1979). The Court has repeatedly stated there is no fundamental, historical right to continuing employment as a police officer -- "government employment, in the absence of legislation, can be revoked at the will of the appointing officer." Cafeteria Workers v. McElroy, 367 U.S. 886, 896 (1961) (citing numerous cases); see Bishop v. Wood, 426 U.S. 341, 349-50 & n.13 (1976). And this court has agreed with other circuits that "occupational liberty . . . is not protected by substantive due process." Singleton v. Cecil, 176 F.3d 419, 428 (8th Cir. 1999) (en banc) (quotation omitted).

In finding a liberty interest protected by substantive due process, the court simply brushes these controlling authorities aside without mention. First, the court relies on a portion of the lead opinion in City of Chicago v. Morales, 527 U.S. 41, 53 (1999), in which only three Justices joined, ignoring the Court's explicit statement that its decision was not based on substantive due process grounds. Id. at 64 n.35. Next, the court gives a statement in Meyer v. Nebraska, 262 U.S. 390, 399 (1923) -- that the freedom "to engage in any of the common occupations of life" is a liberty interest protected by the Due Process Clause -- weight the Supreme Court has expressly said it will not bear. See Conn v. Gabbert, 526 U.S. 286, 291 (1999); Singleton, 176 F.3d at 426 n.8 (this liberty interest is "afforded substantive due process protection only when the government completely prohibits, rather than briefly interrupts, a person from engaging in his desired occupational field."). Then, the court uses *procedural* due process cases as establishing a fundamental interest in government employ protected by *substantive* due process. By citing procedural due process cases such as Cafeteria Workers v. McElroy; Board of Regents v. Roth, 408 U.S. 564, 558-60 (1972); and Winegar v. Des Moines Indep. Cmty. Sch. Dist., 20 F.3d 895 (8th Cir.), cert. denied, 513 U.S. 964 (1994), for the proposition that Moran

has a fundamental liberty interest in his employment, the court erroneously equates the property and liberty interests that entitle a public employee to procedural due process -- interests frequently established by state law -- with the fundamental liberty interests required to trigger substantive due process protection. The Supreme Court treats the two liberty concepts as distinct, with the substantive due process concept being far narrower. See Harrah Ind. Sch. Dist. v. Martin, 440 U.S. 194, 197-98 (1979); Paul v. Davis, 424 U.S. 693, 710-13 (1976); Roth, 408 U.S. at 558-59 n.12. Likewise, the court's reference to an employee's right "to be free from an employer's stigmatizing conduct" is insufficient. While marring a public employee's reputation or standing in the community may trigger a procedural due process right to name-clearing process, "it is well established that defamation or injury to reputation by itself does not state a constitutional deprivation." Brayman v United States, 96 F.3d 1061, 1066 (8th Cir. 1996).

Finally, attempting to locate a fundamental liberty interest where none is to be found, the court introduces possible racial bias by Chief Henderson into the equation, when Moran neither pleaded an equal protection claim nor alleged in his complaint that any defendant's conduct was racially motivated. It is improper for an appellate court to reverse the dismissal of claims because the evidence might have supported an unpleaded claim. Moreover, the court's analysis is flawed on its merits. The court cites testimony by Richard Barry, one of Moran's attorneys, that Henderson said during a meeting, "I want the white sergeant." Not only did Chief Henderson deny making the statement, but Andrew Leonard, an attorney present at the meeting representing other police officers under investigation, was called as a witness for Moran and testified on cross and redirect examination:

> Q [by defense counsel]. Did you ever hear [Chief Henderson] say I want the white sergeant.
>
> A. I don't remember. I don't remember that.

*     *     *     *     *

Q [by counsel for Moran]. Let me clarify one point real quickly. you testified under cross-examination that you didn't hear the chief say white sergeant. You didn't remember hearing the chief?

\* \* \* \* \*

A. I recall Sergeant Moran was clearly identifiable, whether it was by name or by descriptive term. I don't remember there being a racial overtone to it.

Q. Everyone in the room knew that the chief meant Moran, correct?

A. Yes. Yes.

In my view, if an African-American police chief said, "I want the white sergeant," in a meeting held under these circumstances, an attorney for police officers under active investigation for alleged use of excessive force against a mentally-impaired citizen would surely recall that statement. The rule that we must view evidence in the light most favorable to Moran does not warrant manufacturing an unpleaded claim of reverse race discrimination from one scrap of testimony that has little or no credibility. We may only draw *reasonable* inferences in favor of a nonmoving party. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Moreover, even if Henderson made the statement, in light of attorney Leonard's testimony it is pure speculation to infer that racial prejudice improperly motivated the chief's conduct. A "reasonable inference" is "one which may be drawn from the evidence without resort to speculation." Fought v. Hayes Wheels Intern., Inc., 101 F.3d 1275, 1277 (8th Cir. 1996) (quotation omitted).

In summary, Moran tried the case and the panel decided his appeal on the mistaken assumption that proof of conscience-shocking misconduct establishes a substantive due process violation. The en banc court now fails in its belated attempt to find a fundamental historical interest entitled to substantive due process protection

under Supreme Court precedents and this court's decision in <u>Singleton</u>. Therefore, I would affirm the dismissal of Moran's substantive due process claim on this ground.

**B.** **<u>Shocks the Conscience.</u>** To violate substantive due process, the misconduct of government officials that violates a citizen's fundamental rights must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience" of federal judges. <u>Lewis</u>, 523 U.S. at n.8. In adopting the conscience-shocking standard, the Court explained that it "duplicates no traditional category of common-law fault, but rather points clearly away from liability, or clearly toward it, only at the ends of the tort law's spectrum of culpability." <u>Id.</u> at 848. The Court also emphasized that substantive due process, like procedural due process -

> is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.

<u>Id.</u> at 850, quoting <u>Betts v. Brady</u>, 316 U.S. 455, 462 (1942). Applying this standard, I conclude defendants' individual and collective conduct was not conscience-shocking in the constitutional sense. The following is a brief chronological review of undisputed facts established by Moran's case-in-chief at trial.

• On April 14, a mentally-impaired teenager was seriously injured in his own home while resisting arrest by two police officers who mistook him for a burglar.

• Responding to witness allegations of an abusive police beating, and repeated inquiries from the media, when Chief Henderson learned that Gregory Bell was mentally challenged and not a burglar, he publicly apologized to the family for the mistake. The court finds it shocking that Chief Henderson publicly apologized for the beating of a young, mentally-impaired citizen being arrested as a burglar in his own home. Given the potential for civil unrest inherent in such an incident, it would be more shocking if the Chief of Police of a major city had not responded in this

manner. The court further concludes that Moran's evidence "tends to show a police department that publicly and financially committed itself to producing a culprit for an alleged wrongdoing before any such wrongdoing was actually established." <u>Ante</u> p. 16. Here is the relevant testimony:

> Q [by counsel for Moran]. You apologized for the police department to that family and you promised that you would find out who was the wrongdoer and punish him, didn't you do that, Chief?
>
> A. No, what I recall is I promised that we would do a thorough, efficient and effective investigation and if there was any wrongdoing we would take the appropriate action is what I said.

• Chief Henderson then involved himself personally in the ensuing Internal Affairs investigation. Though no doubt unusual, it is hardly "questionable" for a department head to become personally involved in a high-profile investigation into police misconduct.

• In the first week after the incident, Officer Booker submitted a police report that did not place Moran at the scene until Bell was brought outside the home. All officers interviewed by the Internal Affairs investigators gave statements consistent with this report.

• On April 19, Chief Henderson learned that Officer Barry Greene wished to make a statement contradicting the police report. Henderson and Internal Affairs officials met with Greene and heard him implicate Moran in the beating of Gregory Bell. Henderson and the others then took Officer Greene to Circuit Attorney Dee Joyce-Hayes, who heard Greene's statement and took the matter to a grand jury, which returned an indictment against Moran.

• After hearing Greene's contrary statement, Chief Henderson told attorneys Barry and Leonard he did not believe the police report and the officers' initial

-29-

statements corroborating that report. Henderson advised the attorneys that any officer who told the truth in a second statement would not be disciplined if it contradicted his initial statement. Officer DuPree, who had previously admitted to attorney Leonard that his initial statement was untruthful in some respects, then gave a second statement placing Moran at the scene during the melee but not hitting Bell. The court describes this as evidence of "pressures placed on officers to incriminate a specific person or corroborate the department's official line." Ante p. 16. The tactics strike me as entirely appropriate probing by investigators faced with conflicting statements. Significantly, every police officer who testified at trial said he was repeatedly told to tell the truth, was not told what to say by any investigator or defendant, and did not feel pressured to lie. This fell far short of a conscience-shocking investigation. Compare Wilcox v. Ford, 813 F.2d 1140, 1146-48 (11th Cir. 1987).

• Faced with conflicting statements by Greene and DuPree, the two officers who placed Moran at the scene during some of the melee, and with numerous statements by other officers exonerating Moran, Chief Henderson and the other defendants left the criminal prosecution in the hands of the Circuit Attorney, who pursued the prosecution through a trial while the Police Department pursued administrative charges. Sergeant Moran was acquitted of the criminal charges, and after a hearing, the Board of Police Commissioners acquitted him of all but one administrative charge. Moran appealed; the Circuit Court for the City of St. Louis affirmed the Police Board's disciplinary action.

Based on the evidence introduced by Moran at trial, I conclude he proved nothing even approaching conscience-shocking misconduct by any defendant. Moran was present during a tragic encounter between police and a young man who could not explain his innocent behavior. Moran was accused by a fellow police officer of participating in an unnecessary beating of that citizen. Facing these serious charges, Moran had a right to procedural due process in the ensuing criminal and administrative proceedings. He was afforded that right and was ultimately found not guilty of using excessive force. The entire process was surely stressful, humiliating,

-30-

and expensive, and it is unfortunate that a public servant engaged in this hazardous line of work should be required to defend himself in this fashion from charges that prove to be unfounded.  But as Chief Justice Rehnquist said in Baker v. McCollan, 443 U.S. at 145, "[t]he Constitution does not guarantee that only the guilty will be arrested.  If it did, § 1983 would provide a cause of action for every defendant acquitted -- indeed, for every suspect released."  On the undisputed facts of this case, procedural due process is all the protection the Due Process Clause affords.

Moreover, even if I were to accept the unreasonable fact inferences the court draws from this record, I would still conclude that Moran failed to present a submissible case of conscience-shocking misconduct.  The Supreme Court has consistently "rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law."  Collins, 503 U.S. at 128; see Shrum v. Kluck, 249 F.3d 773, 779 (8th Cir. 2001) ("[t]he purpose of [the shocks the conscience] fault standard is to distinguish the constitutionally-based § 1983 liability from traditional tort law claims"); Marler v. Missouri State Bd. of Optometry, 102 F.3d 1453, 1458 (8th Cir. 1996).  Although used sparingly, Missouri's tort of malicious prosecution specifically protects its citizens from the acts alleged by Moran to be conscience-shocking.  The alleged police misconduct -- engaging in a conspiracy to manufacture and use false testimony to prosecute an innocent police officer -- is exactly the type of misconduct the tort of malicious prosecution is designed to remedy.  See Mershon v. Beasley, 994 F.2d 449, 453 (8th Cir. 1993).  In these circumstances, it is inappropriate to find the conscience-shocking element necessary for a substantive due process violation.

## II.  Malicious Prosecution.

To prove malicious prosecution under Missouri law, Moran must prove that one or more defendants initiated or continued a prosecution without probable cause. "The charge of malicious prosecution is no favorite of the law and when made the elements necessary to sustain it must be strictly and clearly proven."  Harper v. St.

Joseph Lead Co., 233 S.W.2d 835, 838 (Mo. 1950). At trial, Moran introduced no evidence tending to show that any defendant was responsible for the initiation or continuation of his criminal prosecution. On the contrary, the evidence showed that the decisions to seek an indictment and to initiate and pursue the prosecution rested exclusively with the Circuit Attorney, Dee Joyce Hayes, who did not testify during plaintiff's case. "The return of an indictment by a grand jury is prima facie evidence of probable cause in an action for malicious prosecution" which may be rebutted only by "proof that the indictment was obtained by false or fraudulent testimony or by other improper means, or that defendant procured the indictment believing plaintiff to be innocent." Harper, 233 S.W.2d at 839-40. Moran introduced no such evidence at trial. Accordingly, the district court did not err in granting judgment as a matter of law dismissing the malicious prosecution claim.

The other issues raised by Moran on appeal are reviewed under the abuse of discretion standard and in my view are without merit. For all of the aforementioned reasons, I would affirm the district court and therefore respectfully dissent.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-32-